**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 12-2498

———————

PHILIP MORRIS USA, INCORPORATED,

        Plaintiff - Appellant,

    v.

THOMAS J. VILSACK, Secretary of Agriculture; UNITED STATES DEPARTMENT OF AGRICULTURE,

        Defendants – Appellees,

CIGAR ASSOCIATION OF AMERICA, INCORPORATED,

        Intervenor/Defendant – Appellee.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Henry E. Hudson, District Judge. (3:11-cv-00087-HEH)

———————

Argued: September 19, 2013      Decided: November 20, 2013

———————

Before DUNCAN and THACKER, Circuit Judges, and Gina M. GROH, United States District Judge for the Northern District of West Virginia, sitting by designation.

———————

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Thacker and Judge Groh joined.

———————

**ARGUED:** Lauren R. Goldman, MAYER BROWN, LLP, New York, New York, for Appellant. Sydney Foster, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Daniel Gordon Jarcho, MCKENNA, LONG & ALDRIDGE, LLP, Washington, D.C., for Appellees. **ON BRIEF:** Dan

Himmelfarb, Richard P. Caldarone, MAYER BROWN LLP, Washington, D.C., for Appellant. Neil H. MacBride, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Stuart F. Delery, Acting Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

DUNCAN, Circuit Judge:

Philip Morris brings this appeal seeking review of a United States Department of Agriculture decision regarding the implementation of the Fair and Equitable Tobacco Reform Act ("FETRA").  Pub. L. 108-357 § 601, 118 Stat. 1418, 1521 (2004) (codified at 7 U.S.C. §§ 518 et seq.).  FETRA instructs USDA to levy certain assessments against manufacturers and importers[1] of tobacco products.  Philip Morris challenges USDA's decision to use 2003 tax rates instead of current tax rates in calculating how these assessments are to be allocated across manufacturers of different tobacco products.  The district court concluded that USDA's decision was based upon a reasonable interpretation of FETRA and granted USDA's motion for summary judgment.  For the reasons that follow, we affirm.

I.

In 2004, Congress enacted FETRA to end the system of quotas and other price supports that tobacco growers in the United States had enjoyed since the passage of the Agricultural Adjustment Act of 1938.  It chose, however, to ease the transition from the old quota system by replacing it with a

---

[1] For brevity's sake, we will refer solely to manufacturers. "Manufacturers" may therefore be taken to mean "manufacturers and importers."

3

temporary system of periodic payments to tobacco growers and other holders of tobacco quotas. The payments began in 2005 and are to cease in 2014. See 7 U.S.C. §§ 518a & 518b. FETRA created the Tobacco Trust Fund to fund these payments. The fund is administered by the Commodity Credit Corporation ("CCC"), a government corporation administered by USDA, and funded with CCC assets as well as assessments imposed on manufacturers of tobacco products. 7 U.S.C. § 518e. At issue in this case is the permissibility of USDA's chosen method for making those assessments.

A.

Each year, FETRA requires USDA to determine the total amount of funds that must be raised through the assessment process in order to make the payments required for that year under 7 U.S.C. §§ 518a & 518b and to cover other fund expenses. 7 U.S.C. § 518d(b)(2). Then, USDA is to follow a two-step procedure to determine what portion of that total amount is to be paid by each manufacturer of tobacco products.

In the first step of that procedure, USDA is instructed to calculate the percentages of the total national assessment to be paid collectively by the manufacturers of each class of tobacco product: cigarettes, cigars, snuff, roll-your-own tobacco, chewing tobacco, and pipe tobacco. 7 U.S.C. § 518d(c). Then, at step two, USDA is to determine each manufacturer's individual

4

liability by multiplying its market share within each class by that class's total assessment burden as calculated in step one. 7 U.S.C. §§ 518d(e),(f). USDA performs these calculations in an initial determination at the beginning of each year, and then collects the resulting amounts from manufacturers in quarterly payments. Described at this level of abstraction, the procedure seems simple, but this veneer of simplicity dissolves under closer examination.

1.

Congress's instructions for determining each class's total assessment burden are sparse. FETRA provides specific percentages of the assessment burden to be allocated to each of the six classes of tobacco product in fiscal year 2005. 7 U.S.C. § 518d(c)(1). But for subsequent years, the statute instructs only that these percentages are to be adjusted "to reflect changes in the share of gross domestic volume" held by each class of product. 7 U.S.C. § 518d(c)(2). "Gross domestic volume," in turn, is defined as the volume of product "removed into commerce"[2] and subject to federal excise taxes or import tariffs at the time of removal. 7 U.S.C. § 518d(a)(2)(A).

---

[2] FETRA uses the Internal Revenue Code definition for "removal": "the removal of tobacco products or cigarette papers or tubes, or any processed tobacco, from the factory or from internal revenue bond . . . , or release from customs custody, and shall also include the smuggling or other unlawful
(Continued)

Volumes of different classes of tobacco product are measured in different units. Volumes of cigarettes and cigars are measured in sticks, but volumes of all other tobacco products are measured in pounds. See 7 U.S.C. § 518d(g)(3) (prescribing units of measurement to be used in calculating "volume of domestic sales"); 26 U.S.C. § 5701 (prescribing excise tax rates per stick for cigars and cigarettes, and per pound for the other classes of tobacco product). USDA determined that, in arriving at the initial allocations in § 518d(c)(1), Congress converted these volumes into a common unit--dollars--by multiplying each class's volume by the maximum excise tax rate applicable to that class. To arrive at a percentage for each class, the resulting dollar amount for each class was then divided by the sum of all dollar amounts across all six classes. See Tobacco Transition Assessments, 70 Fed. Reg. 7007-01, 7007 (February 10, 2005) (codified at 7 C.F.R. pt. 1463). The statute itself, however, does not explain that this is how the initial allocations were determined or explicitly indicate that future allocations are to be arrived at in this way.

---

importation of such articles into the United States." 26 U.S.C. § 5702(j).

6

2.

Step two of the FETRA allocation procedure deals with subdividing the step-one inter-class allocation among manufacturers of tobacco products within each class. As a starting point, FETRA provides that the total assessment for each class of tobacco product is to be allocated among the manufacturers of that class "based on" each manufacturer's share of gross domestic volume. 7 U.S.C. § 518d(e)(1). More specifically, this allocation is to be calculated by multiplying each manufacturer's market share within a class by that class's total allocation from step one. 7 U.S.C. § 518d(f). A manufacturer's market share, in turn, is to be its "share" of the "volume of domestic sales" for that class of product. 7 U.S.C. § 518d(a)(3).

Compared to its skeletal treatment of "gross domestic volume," FETRA provides considerable detail about how to calculate "volume of domestic sales." FETRA devotes two subsections to the latter, one for "determining" it and another for "measuring" it. 7 U.S.C. §§ 518d(g),(h). USDA is instructed to calculate volume of domestic sales based upon gross domestic volume, forms relating to a manufacturer's volume of removals and taxes paid, and "any other relevant information." 7 U.S.C. §§ 518d(g)(1),(g)(2),(h)(2). Thus, while § 518(e)(1) instructs USDA to base its intra-class

7

allocations on gross domestic volume, § 518(g) indicates that other factors are to be considered as well.

B.

In February of 2005, USDA promulgated a final rule implementing the FETRA assessment methodology codified at 7 U.S.C. § 518d. Tobacco Transition Assessments, 70 Fed. Reg. 7007-01 (February 10, 2005) (codified at 7 C.F.R pt. 1463). That rule provided that USDA would determine each year's inter-class allocation on the basis of "each class's share of the excise taxes paid . . . . [b]ased upon the reports filed by domestic manufacturers and importers of tobacco products with the Department of the Treasury and the Department of Homeland Security." 7 C.F.R. § 1463.5(a) (2005).[3]

With this interpretation in place, Congress incorporated the FETRA methodology into another statute, the Family Smoking Prevention and Tobacco Control Act ("FSPTCA"), Pub. L. 111-31, 123 Stat. 1776 (2009). That statute relies upon the FETRA methodology to determine the "user fee" to be paid by manufacturers of tobacco products to the Food and Drug Administration to fund the exercise of its newly conferred

---

[3] USDA reiterated this language--that it would use "excise taxes paid"--in its briefs in an unrelated case before the Eleventh Circuit. Swisher Int'l, Inc. v. Schafer, 550 F.3d 1046 (11th Cir. 2008).

jurisdiction to regulate them. Id. § 919(b)(2)(B)(ii) (codified at 21 U.S.C. § 387s(b)(2)(B)(ii)).

Congress also passed the Children's Health Insurance Program Reauthorization Act of 2009 ("CHIPRA"). Pub. L. No. 111-3, 123 Stat. 8. As well as expanding federal health insurance programs for children, that bill also increased the excise taxes on every class of tobacco product. CHIPRA § 701. The cigar industry, through the Cigar Association of America, mounted a lobbying campaign to persuade Congress not to increase excise taxes on cigars on the grounds that the tax itself would be burdensome and that the change in rates would increase the cigar industry's FETRA assessment burden. This campaign reached "a great many congressional members." J.A. 167. But the lobbying effort, it would seem, did not succeed. CHIPRA equalized the tax rates for cigarettes[4] and small cigars at $50.33 per thousand. CHIPRA §§ 701(a)(1), (b)(1).

Though the rates were equalized, the relative change in rates was much larger for cigars than cigarettes. While the

---

[4] The Internal Revenue Code defines two categories of cigarette, large and small. For the years at issue here, however, no large cigarettes were actually removed. See, e.g., Alcohol and Tobacco Tax and Trade Bureau, Department of the Treasury, Statistical Report: Tobacco (Dec. 2005) (indicating that no large cigarettes were removed in 2004 or 2005). (Reports for other years also show that no large cigarettes were removed.) We will therefore use "cigarette" to refer only to small cigarettes.

9

rate for cigarettes was increased to $50.33 from $19.50 per thousand, 26 U.S.C. § 5701(b)(1) (2000); CHIPRA § 701(b)(1), the rate for small cigars increased to $50.33 from only $1.828 per thousand, 26 U.S.C. § 5701(a)(1) (2000); CHIPRA § 701(a)(1). The tax rate for large cigars was also greatly increased: the rate increased from $48.75 per thousand cigars to $402.60 per thousand cigars.[5]   26 U.S.C. § 5701(a)(2) (2000); CHIPRA § 701(a)(3).

## C.

As described above, the FETRA inter-class allocation calculates each class's share of the burden by multiplying the removed volume of each class of product by the maximum applicable excise tax rate.   USDA's regulations at the time CHIPRA was enacted provided that inter-class allocations would be determined on the basis of "each class's share of the excise taxes paid," which implied that USDA would use current tax rates in performing these calculations.[6]   Therefore the tax rate changes in CHIPRA would have substantially reduced the burden

---

[5] The act expresses this rate as "40.26 cents per cigar." CHIPRA § 701(a)(3).

[6] Beyond this implication, however, USDA never explicitly took a position on how future changes in the excise tax rates would be reflected in the inter-class allocation process.   The tobacco excise tax rates had remained constant during the life of the FETRA program until the enactment of CHIPRA.

allocated to the cigarette industry and shifted it to manufacturers of other types of tobacco products. The cigar industry in particular would have seen a marked increase in its liability.

After the passage of CHIPRA, however, USDA promulgated a technical amendment to 7 C.F.R. § 1463.5 to make clear that it would continue to use the 2003 tax rates--the rates applied by Congress in setting the fiscal year 2005 allocations. Tobacco Transition Payment Program; Tobacco Transition Assessments, 75 Fed. Reg. 76921-01 (Dec. 10, 2010) (to be codified at 7 C.F.R pt. 1463). This amendment altered the text of the regulation such that USDA would calculate each class's share of the year's assessment on the basis of "each class's share of the excise taxes paid <u>using for all years the tax rates that applied in fiscal year 2005</u>." 7 C.F.R. § 1463.5(a)(2010) (emphasis added). USDA published an extensive explanation of the amendment, 75 Fed. Reg. at 76921-01, which it summarized as follows:

> [USDA] is modifying the regulations for the Tobacco Transition Payment Program (TTPP) to clarify, consistent with current practice and as required by the Fair and Equitable Tobacco Reform Act of 2004 (FETRA), that the allocation of tobacco manufacturer and importer assessments among the six classes of tobacco products will be determined using constant tax rates so as to assure that adjustments continue to be based solely on changes in the gross domestic volume of each class. This means that [USDA] will continue to determine tobacco class allocations using the Federal excise tax rates that applied in fiscal year 2005. These are the same tax rates used when TTPP was

11

> implemented and must be used to ensure, consistent with FETRA, that changes in the relative class assessments are made only on the basis of changes in volume, not changes in tax rates. This technical amendment does not change how the TTPP is implemented by [USDA], but rather clarifies the wording of the regulation to directly address this point.

Id.

D.

The technical amendment first had an effect in USDA's allocation of the fiscal year 2011 national assessment. Philip Morris contends that, because USDA used the pre-CHIPRA tax rates, it calculated that the cigarette industry would pay 91.6% of the national assessment instead of 78.5%, the maximum that would have been allocable to it had the then-current rates been applied. The cigar class was allocated 7.1% instead of 19.5%. In the first quarterly assessment of that year, therefore, manufacturers of cigarettes paid approximately $219 million instead of $188 million. Of this $219 million, $99 million was assessed to Philip Morris by virtue of its cigarette market share. Had USDA allocated only $188 million to the cigarette class, Philip Morris's individual assessment would have been significantly lower.

Philip Morris appealed this assessment, as well as the assessments for the next two quarters, to the Secretary of Agriculture under 7 U.S.C. 518d(i). USDA denied all three appeals on the basis that the appeal process could only be used

12

to assert mathematical or factual errors, not to challenge the assessment formula itself.

Philip Morris also petitioned USDA for a rulemaking that would, in effect, repeal the December 10, 2010 technical amendment to 7 C.F.R. § 1463.5, 75 Fed. Reg. 76921-01, and require USDA to always use current tax rates. USDA rejected that petition. See 76 Fed. Reg. 71934-02 (Nov. 21, 2011).

Finally, Philip Morris brought this lawsuit, arguing that USDA's December 10, 2010 technical amendment was inconsistent with FETRA. It sought an order vacating that amendment, restraining USDA from collecting assessments in excess of what Philip Morris would have paid had current tax rates been applied, and directing USDA to refund the excessive payments Philip Morris had already made. At summary judgment, however, the district court concluded that USDA's methodology "faithfully adjust[s] the percentage of the total amount required to be assessed against each class of tobacco product . . . as directed by 7 U.S.C. § 518d(c)(2)" and "reasonably reflects the congressional intent underlying FETRA." Philip Morris USA Inc. v. Vilsack, 896 F. Supp. 2d 512, 524 (E.D. Va. 2012). Accordingly, it granted USDA's motion for summary judgment. This appeal followed.

13

In determining whether USDA's decision to use only the tax rates applicable in 2005 is permissible, we conduct the two-step analysis articulated in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). We first ask whether "Congress has directly spoken to the precise question at issue." Id. at 842. At step one, we employ "the traditional rules of statutory construction." Elm Grove Coal Co. v. Dir., O.W.C.P, 480 F.3d 278, 293-94 (4th Cir. 2007) (quoting Brown & Williamson Tobacco Corp. v. FDA, 153 F.3d 155, 162 (4th Cir. 1998)). In so doing, we consider "the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and . . . other relevant statutes." Id. At this stage, the court gives no weight to the agency's interpretation. Mylan Pharm., Inc. v. FDA, 454 F.3d 270, 274 (4th Cir. 2006). If the court determines that Congress's intent is clear, then the inquiry ends and Congress's intent is given effect. See Chevron, 467 U.S. at 843.

If we conclude that Congress has not clearly answered the question at issue, we then consider whether the agency's interpretation of the statute is based upon a permissible construction of the governing statute. Id. at 843. To elucidate the gaps and ambiguities in the programs created by Congress is one of the core functions of an administrative

14

agency, a function that we presume Congress intentionally invokes in drafting such a statute. Id. at 843-44. We therefore will not usurp an agency's interpretive authority by supplanting its construction with our own, so long as the interpretation is not "arbitrary, capricious, or manifestly contrary to the statute." Id. at 844. A construction meets this standard if it "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." Id. at 485 (quoting United States v. Shimer, 367 U.S. 374, 383 (1961)).

When an agency's decision constitutes a change in position, the court must be satisfied that such a change in course was made as a genuine exercise of the agency's judgment. Such a change does not, however, require greater justification than the agency's initial decision. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). We defer to the agency's new position no less than the old, so long as we are satisfied that the agency's change in position was intentional and considered. It is not the court's role to evaluate whether the agency's reasons for its new position are better than its reasons for the old one. Id. We review the district court's factual and legal conclusions on an administrative record de novo. Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 189 (4th Cir. 2009).

15

A.

We begin our Chevron step one analysis with this most basic observation: nowhere does FETRA explicitly say that USDA is required to use any tax rate at all in computing an inter-class assessment allocation, much less that it must use the rates that were applicable in any particular year. The statute's only overt references to taxes or tax rates can be found in 7 U.S.C. §§ 518d(a)(2)(B) & (h)(2)(B). Section 518d(a)(2)(B) requires that gross domestic volume only include tobacco product that is taxable when removed. Section 518d(h)(2)(B) requires that manufacturers of tobacco products submit copies of forms related to their excise tax payments. Significantly, neither of these provisions deal directly with the computation of inter-class assessment allocations.

Instead it was USDA that discovered, through mathematical reverse engineering, that Congress had used the excise tax rates applicable in 2003 to compute the initial assessment allocation in § 518d(c)(1). USDA determined that it could reproduce the numbers in that paragraph by obtaining volume information from publically available statistical reports published by the Treasury Department[7] and multiplying those volumes by the maximum

_____

[7] See, e.g., Alcohol and Tobacco Tax and Trade Bureau, Department of the Treasury, Statistical Report: Tobacco (Dec. 2005).

excise tax rate applicable to each class of product. This process generated dollar amounts that, when taken as percentages of the total dollar amount across all six classes, corresponded with the percentages in § 518d(c)(1).

But even at Chevron step one, we must not confine ourselves to a merely superficial reading of the statute. We must also make use of our traditional tools of statutory construction to determine whether Congress's intent is revealed in more subtle--though still unambiguous--ways. Elm Grove Coal, 480 F.3d at 293-94.

Notwithstanding the lack of any overt reference to a current-tax-rate requirement, Philip Morris argues that such a requirement is implied from the overall structure of the statute and by subsequent congressional action. It does so by cobbling together various provisions relating to FETRA's intra-class allocation procedure and by speculating about the policy goals of Congress's chosen method for performing the inter-class allocation calculations. Philip Morris's reading of FETRA may be a plausible one, but its burden is far higher than showing plausibility. To disturb USDA's decision at Chevron step one, it must persuade us that USDA's decision is contrary to the unambiguously expressed intent of Congress. This it has not done.

17

1.

Philip Morris argues that "Congress commanded USDA to adjust the class shares based upon changes in the share of currently taxable removals" in § 518d(a)(2)(B). Therefore, it argues, "it follows that Congress intended USDA to use current rates." Appellants' Br. at 27 (emphasis omitted). Philip Morris's premise is correct, but its conclusion does not necessarily follow. It might have made sense to use the same edition of the Internal Revenue Code to determine what products are to be included in gross domestic volume and to determine how volumes are to be translated into percentages. But there is nothing incoherent about taking a different approach.

To conclude otherwise would invert the standard we apply under Chevron step one: we vacate an agency's decision if Congress clearly manifested a contrary intent, not when Congress could have but did not clearly manifest its approval. In this light, congressional silence might actually cut the other way. Section 518d(a)(2)(B) exemplifies language that Congress could have used in § 518d(c), but conspicuously did not, to make clear that current tax rates were to be used in calculating the assessment allocations.

2.

Philip Morris argues that Congress clearly indicated that it expected USDA to always use current rates in the inter-class

18

allocations by requiring manufacturers to submit forms "that relate to . . . the payment of [tobacco product excise taxes]." But FETRA only instructs USDA to use these forms as a part of the intra-class allocation process.

The requirement that manufacturers submit these forms appears in § 518d(h), which is entitled "Measurement of volume of domestic sales." Consistent with this characterization, FETRA only requires that USDA actually use the forms in one place: § 518d(g)(1). This paragraph directs USDA to compute volume of domestic sales, not gross domestic volume, "based on information provided by the manufacturers and importers . . . as well as any other relevant information. . . ." Id. And, as we have noted, FETRA only instructs USDA to use volume of domestic sales for one purpose: computation of a manufacturer's market share to determine the intra-class allocations at step two of the FETRA assessment procedure. §§ 518d(a)(3),(f).[8]

_____

[8] Philip Morris also points out that "the forms relate to calculations concerning 'all manufacturers and importers [within a class] as a group.'" Appellants' Brief at 35. But this is quite a selective quotation of § 518d(g)(1). What the statute actually says is that the forms are to be used in calculating "the volume of domestic sales of a class of tobacco product . . . by all manufacturers and importers as a group." Id. The obvious purpose of this is to form the denominator of the fraction contemplated by § 518d(f)(2) in calculating market share.

Philip Morris argues that Congress cannot have intended to require the use of these forms only for the intra-class allocation because information about taxes paid is unnecessary for those calculations. This is so, it contends, because intra-class market share calculations will always be apples-to-apples (or cigar-to-cigar, etc.) comparisons. Therefore, unlike the inter-class allocation that deals with differing units of measurement, there is no need to use the excise tax rates as a conversion factor for intra-class calculations.

This overlooks, however, the possibility that Congress intended for USDA to use these forms for some purpose other than unit conversion. They could be valuable, for example, in determining the volume of taxable products actually removed by each manufacturer. Indeed, the record indicates that USDA uses the forms in exactly this way. But even if Philip Morris's assumption were correct, the forms' irrelevance would be an infirmity in FETRA, not in USDA's interpretation of it. That the data might be superfluous in the calculation for which Congress directed it be used does not amount to a clear articulation that it should actually be used for some other purpose.

3.

Philip Morris's remaining step one arguments presuppose the existence of a textual basis for concluding that Congress

20

intended for USDA to always use current rates under 518d(c). But, for the reasons discussed above, we conclude otherwise. The only direct evidence of Congress's intent in this regard is its actual use of the then-current 2003 rates, in establishing the initial allocation under § 518d(c)(1). But this provides no basis for determining whether Congress intended that USDA would always use current rates or that it would always use 2003 rates. The minimal textual evidence is equally consistent with both methodologies.

This conclusion dooms Philip Morris's remaining Chevron step one arguments. Most basically, Philip Morris argues that USDA must follow the methodology Congress used in establishing its initial allocation, and that this methodology was to use the excise taxes that applied in the year the products were removed. But, as we have just pointed out, there is no independent textual support for this contention.

Philip Morris also argues that, in adjusting for changes in each class's share of gross domestic volume, Congress decided to use each class's then-current excise tax burden as the factor with which to convert volumes to shares. But this argument begs the same question.

Likewise, we are not persuaded by Philip Morris's argument that Congress intended to further the policies underlying its choice of excise tax rates by building them into the FETRA

21

assessment allocation. There is no evidence in the text of FETRA or elsewhere to indicate that Congress intended to use FETRA as a vehicle to further tax policy writ large. The record equally supports the conclusion that Congress used the 2003 excise tax rates only because they were a useful mathematical expedient. Therefore, having found no clear statement of Congressional intent, we turn to step two of the Chevron analysis.

B.

The Chevron step two analysis brings us closer to the heart of this dispute. Here we examine whether USDA's decision is based upon a permissible reading of FETRA, a reading that reflects a reasonable balancing of the policy considerations that Congress entrusted to USDA's care. Chevron, 467 U.S. at 843-45. We do not evaluate which interpretation of FETRA is best. That is a responsibility delegated by Congress to USDA. Our task is simply to determine whether USDA's interpretation is reasonable in light of all we know about Congress's intent in passing it.

Many of Philip Morris's arguments at step two of the Chevron analysis are reiterations of its step-one arguments. They are equally unavailing in the context of Chevron step two.

In particular, as it did under Chevron step one, Philip Morris contends that USDA was entrusted with all of the complex

22

and important policy considerations that drive tax law generally. USDA's interpretation is unreasonable, it argues, because it disregards the considerations reflected in other statutes involving tobacco excise taxes. But as we concluded above, there is no evidence that Congress intended for FETRA to do anything more than provide a workable methodology for the allocation of assessments across manufacturers of tobacco product.

Philip Morris does, however, present some independent step-two arguments. It argues that USDA's decision is based upon an interpretation of FETRA at odds with the text of the statute,[9] that USDA's decision is inconsistent with its previous position, and that Congress subsequently entrenched this prior position, rendering it immune to further modification by the USDA. We consider each of these arguments in turn, and conclude that, as at step one, Philip Morris presents nothing more than a plausible alternative reading of FETRA.

---

[9] We consider this under <u>Chevron</u> step two because Philip Morris's argument targets not the consistency of USDA's decision itself with the text of FETRA, but the permissibility of the statutory interpretation that underlies it. <u>See</u> <u>Chevron</u>, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

Philip Morris argues that USDA's decision to continue using 2003 rates rests on an impermissible interpretation of the phrase "share of gross domestic volume" in § 518d(c)(2). USDA has interpreted that term to mean a given class's "contribution to the total" such that the share changes only in response to changes in actual volume produced. Philip Morris presents two arguments. First it argues that USDA's interpretation defines "share of gross domestic volume" as a volume and, thus, makes it synonymous with a different statutory term, "volume of domestic sales." In the alternative, Philip Morris argues that USDA's interpretation has defined the term as a percentage but impermissibly uses different conversion rates for calculating this percentage at the two steps of the assessment process--2003 tax rates for the inter-class allocation, but current tax rates for the intra-class allocation.[10]

These arguments are, however, unavailing. A volume is an actual number of objects in an absolute sense. But a share, as USDA has interpreted it, is an abstract relationship between a volume and a larger total volume. USDA's interpretation

---

[10] It also argues that USDA is obliged to use the same conversion factor as Congress did in arriving at the initial class allocations in § 518d(c)(1). This argument fails for the reasons explained in part II.A.3 supra.

therefore defines "share of gross domestic volume" differently from "volume of domestic sales."

"Share of gross domestic volume," as USDA has interpreted the term, also need not be a percentage. A percentage is a numerical representation of a share, not the share itself. Therefore "share of gross domestic volume" as USDA has interpreted it, need not incorporate any conversion factor at all. Philip Morris argues that USDA does, in fact, use taxes actually paid (and thus current tax rates) as a conversion factor in the intra-class allocation procedure. But USDA uses taxes paid as a proxy for the volume of product removed, not as a conversion factor to relate volumes to one another. Therefore, although USDA's interpretation may not be the most natural reading of the statute, it is a reasonable one, and that is all that Chevron requires.

2.

As we noted earlier, prior to USDA's December 10, 2010 technical amendment, many members of Congress were informed that under USDA's regulations at the time, changes in excise tax rates would affect the FETRA assessment calculations. Philip Morris argues that Congress, in effect, legislated that view, rendering it impervious to modification by USDA, when it did two things. First, Congress passed CHIPRA, with its dramatic tax increase on cigar manufacturers, over the protestations of the

25

cigar industry that this change would increase its assessment burden under FETRA.  Second, Congress passed FSPTCA, which gave the Food and Drug Administration the authority to regulate tobacco and, to fund these new duties, imposed user fees on manufacturers of tobacco products.  In allocating these fees across "users," it provides that "[t]he applicable percentage of each class of tobacco product . . . for a fiscal year shall be the percentage determined under [FETRA] for each such class of product for such fiscal year."  21 U.S.C. § 387s(b)(2)(B)(ii).

Therefore, Philip Morris argues, because Congress was aware of USDA's original interpretation, and took action without disturbing that interpretation, it sub silentio ratified and entrenched it.  Thus, Philip Morris contends, USDA's prior interpretation now has, in effect, the force of a statute and USDA cannot deviate from it without congressional action.

But we have never articulated such a standard for entrenchment, and for good reason: it is far too low.  If Philip Morris's formulation were the standard, Congress would inadvertently entrench agency interpretations much too frequently, resulting in extensive ossification of our regulatory system--the signal virtue of which is its flexibility.  Such a standard would therefore contravene the axiom that agencies "must be given ample latitude to 'adapt their rules and policies to the demands of changing

26

circumstances.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 156-57 (2000) (quoting Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983)).

Brown & Williamson provides a useful model of what sort of congressional action would be required to entrench an agency's interpretation. In Brown & Williamson the question was whether congressional action had ratified the FDA's prior conclusion that it lacked jurisdiction to regulate tobacco products. In concluding that it had, the Court devoted thirteen pages in the U.S. Reports to narrating the 35-year pattern of congressional action on the issue, id. at 143-156, of which the following is merely a summary:

> Congress has enacted several statutes addressing the particular subject of tobacco and health, creating a distinct regulatory scheme for cigarettes and smokeless tobacco. In doing so, Congress has been aware of tobacco's health hazards and its pharmacological effects. It has also enacted this legislation against the background of the FDA repeatedly and consistently asserting that it lacks jurisdiction under the [Food, Drug, and Cosmetic Act] to regulate tobacco products as customarily marketed. Further, Congress has persistently acted to preclude a meaningful role for any administrative agency in making policy on the subject of tobacco and health. Moreover, the substance of Congress' regulatory scheme is, in an important respect, incompatible with FDA jurisdiction.

Id. at 155-56. We are not aware of, and Philip Morris has not directed us to, any case where a court has found congressional entrenchment of an agency decision on the basis of anything

27

less.  The circumstances surrounding Congress's enactment of CHIPRA and FSPTCA fall far short of this standard.

3.

Finally, Philip Morris argues that USDA's current position--that it will continue to use 2003 rates in the inter-class allocation--is unreasonable because it is inconsistent with its prior position.  Before the December 10, 2010 technical amendment, USDA's regulations indicated that it would use taxes paid under current rates.

A mere change in position, however, would not in itself render USDA's current position unreasonable.  It is well established that "[a]n initial agency interpretation is not instantly carved in stone."  Chevron, 467 U.S. at 863.  Indeed, a change in an agency's position in itself is not even subject to a heightened level of scrutiny.  Fox Television Stations, Inc., 556 U.S. at 514 (2009); E.E.O.C. v. Seafarers Int'l Union, 394 F.3d 197, 201 (4th Cir. 2005).  Thus, without more, it is of little significance whether USDA's current position is the same as its original one.

Philip Morris argues that USDA has denied changing its position, but it misconstrues USDA's argument.  USDA has only argued that, prior to the December 10, 2010 technical amendment, it had never taken a position on whether future changes in tax rates would affect the FETRA assessment calculations.  There was

no need to have done so because, before that point, the excise tax rates had not changed during the life of the FETRA program. This is a plausible interpretation, and because it is an agency's interpretation of its own regulation, we defer to it. See Auer v. Robbins, 519 U.S. 452, 461 (1997).

USDA has not argued that the decision at issue in this case, the technical amendment's insertion of the words "using for all years the tax rates that applied in fiscal year 2005," 7 C.F.R. § 1463.5(a)(2010), made no difference in the FETRA calculations. Quite the opposite: USDA's recognition of the difference between the original regulation and the amended one is precisely why it issued the technical amendment. Moreover, in response to Philip Morris's rulemaking petition, USDA issued a detailed determination explaining why it would continue to use 2003 rates instead of current rates, as Philip Morris had proposed--an act quite inconsistent with the view that USDA regarded the two approaches as equivalent.

We defer to an agency's interpretation--even if it constitutes a change of position--so long as that decision resulted from a deliberate exercise of the agency's judgment and expertise. Fox Television Stations, Inc., 556 U.S. at 514–15. There can be no dispute on this record that the decision under review is a product of just that process.

III.

We therefore conclude that USDA's decision to make use of only 2003 tax rates in computing the inter-class assessment allocation under 7 U.S.C. 518d(c)(2) is a permissible interpretation of FETRA. There is no clear indication in the text of the statute, or in Congress's prior or subsequent action, that Congress intended for USDA to take a different course. There is similarly no basis for concluding that USDA filled that gap with an unreasonable interpretation. The district court's decision granting USDA's motion for summary judgment is

AFFIRMED.