UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1406**
(WEVA 2013-368-D)

COBRA NATURAL RESOURCES, LLC,

　　　　　Petitioner,

　　v.

FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION; SECRETARY
OF LABOR; MINE SAFETY AND HEALTH ADMINISTRATION, on behalf
of Russell Ratliff,

　　　　　Respondents.

O R D E R

　　　　　The Court amends its opinion filed January 27, 2014,
as follows:

　　　　　On page 8, footnote 7, line 3 -- "§ 815(a)(1)" is
corrected to read "§ 816(a)(1)."

　　　　　　　　　　　　　　For the Court – By Direction

　　　　　　　　　　　　　　/s/ Patricia S. Connor
　　　　　　　　　　　　　　　　　　Clerk

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1406

COBRA NATURAL RESOURCES, LLC,

Petitioner,

v.

FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION; SECRETARY
OF LABOR; MINE SAFETY AND HEALTH ADMINISTRATION, on behalf
of Russell Ratliff,

Respondents.

On Petition for Review of an Order of the Federal Mine Safety
& Health Review Commission. (WEVA 2013-368-D)

Argued: October 29, 2013          Decided: January 27, 2014

Before KING, GREGORY, and AGEE, Circuit Judges.

Petition for review dismissed by published opinion. Judge King
wrote the majority opinion, in which Judge Gregory joined.
Judge Agee wrote a dissenting opinion.

**ARGUED**: William E. Robinson, DINSMORE & SHOHL, LLP, Charleston,
West Virginia, for Petitioner. Nancy E. Steffan, UNITED STATES
DEPARTMENT OF LABOR, Washington, D.C., for Respondents. **ON
BRIEF**: Mary Catherine Funk, DINSMORE & SHOHL, LLP, Charleston,
West Virginia, for Petitioner. M. Patricia Smith, Solicitor of
Labor, Heidi W. Strassler, Associate Solicitor, W. Christian
Schumann, Appellate Ligation Counsel, UNITED STATES DEPARTMENT
OF LABOR, Arlington, Virginia, for Respondents.

KING, Circuit Judge:

Petitioner Cobra Natural Resources, LLC ("Cobra"), seeks appellate relief from a decision of the Federal Mine Safety and Health Review Commission (the "Commission"), temporarily reinstating a coal miner. In October 2012, Russell Ratliff filed a discrimination complaint with the Secretary of Labor, alleging that Cobra had unlawfully retaliated against him under the Mine Safety and Health Act of 1977 (the "Mine Act"), by discharging him on the basis of safety concerns he had articulated with respect to Cobra's mining operations. After an Administrative Law Judge (the "ALJ") determined that Ratliff was entitled to temporary reinstatement pending a final order on his complaint, the Commission affirmed the reinstatement order. Asserting appellate jurisdiction under the collateral order doctrine, Cobra seeks judicial review of the Commission's interlocutory decision. As explained below, we dismiss the petition for lack of jurisdiction.

I.

A.

In response to what was characterized as the "notorious history of serious accidents and unhealthful working conditions" in the coal mining industry, the Mine Act was enacted in 1977 to establish a comprehensive regulatory scheme concerning mine

2

safety and health in this country.  See Donovan v. Dewey, 452 U.S. 594, 603 (1981).  The Act contains a whistleblower provision that prohibits mine operators from discriminating against coal miners for making complaints "under or related to" the Act, including any complaint notifying an operator of "an alleged danger or safety or health violation" in a coal mine. See 30 U.S.C. § 815(c)(1).[1]

Because a complaining coal miner "may not be in the financial position to suffer even a short period of unemployment or reduced income pending resolution of the discrimination complaint," the Mine Act established the temporary reinstatement procedure underlying this proceeding.  See S. Rep. No. 95-181, at 37 (1977), reprinted in 1977 U.S.C.C.A.N. 3401 (1977); see also 30 U.S.C. § 815(c)(2).  Pursuant to the Mine Act, the Secretary receives a miner's discrimination complaint and conducts an appropriate investigation; if it is determined that the complaint was not "frivolously brought," the Secretary applies to the Commission for an order temporarily reinstating

---

[1] Section 815(c)(1) of Title 30 specifies, in relevant part, that a coal operator

> shall [not] discharge or in any manner discriminate against . . . any miner . . . because such miner . . . has filed or made a complaint under or related to [the Mine Act] . . . of an alleged danger or safety or health violation in a coal . . . mine.

the miner's employment, "pending final order on the complaint." See 30 U.S.C. § 815(c)(2). If the coal operator disagrees with the Secretary's determination, it may request a hearing before an ALJ.

A reinstatement order does not require that a coal miner remain employed under any circumstance, but is subject to "changes that occur at the mine after [the order's] issuance." See Sec'y on behalf of Gatlin v. KenAmerican Resources, Inc., 31 FMSHRC 1050, 1054 (2009). Thus, a coal operator's temporary reinstatement obligation can be "tolled" by the occurrence of certain events, such as a subsequent reduction-in-force that would have included the miner. See id. An ALJ's ruling on a temporary reinstatement issue, including whether the reinstatement should be tolled, is subject to discretionary review by the Commission.

Regardless of whether the terminated coal miner is temporarily reinstated, the Secretary must complete the discrimination investigation within ninety days of the filing of the complaint. If it is decided that a violation of the whistleblower provision has occurred, the Secretary must file a complaint with the Commission, which conducts a hearing and issues a final order. If the Secretary instead determines that a violation has not occurred, the temporary reinstatement ends.

4

See N. Fork Coal Co. v. FMSHRC, 691 F.3d 735, 744 (6th Cir. 2012).

B.

Russell Ratliff, a southern West Virginia coal miner, was an equipment operator at Cobra's Mountaineer Mine in Mingo County until, on October 17, 2012, he was abruptly discharged by Cobra. Promptly thereafter, Ratliff filed a discrimination complaint alleging that he had been terminated in retaliation for engaging in protected activity. The Secretary concluded that Ratliff's claim was not frivolous and applied to the Commission for his temporary reinstatement. Cobra requested a hearing on the application, contending that Ratliff's complaint was frivolous and also asserting a tolling defense.[2]

The hearing was conducted before an ALJ on January 7, 2013. In his January 14, 2013 Decision and Order (the "Reinstatement Order"), the ALJ agreed with the Secretary that Ratliff's discrimination complaint was not frivolously brought.[3] The ALJ

---

[2] In addition to seeking to refute Ratliff's claim of retaliatory termination, Cobra relied on a reduction-in-force that occurred at the Mountaineer Mine in November 2012. According to Cobra, Ratliff would have been among those who lost their jobs. As a result, Cobra contended that a temporary reinstatement, even if granted, should be tolled as of January 15, 2012, the last date the laid-off miners were paid.

[3] The Reinstatement Order is found at J.A. 175-94. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this matter.)

5

also rejected Cobra's tolling contention, concluding that Cobra had failed to show that "work [was] not available to [Ratliff]" because of an asserted multi-employee layoff. See Reinstatement Order 18-19 (citing Gatlin, 31 FMSHRC at 1054-55). The ALJ directed Cobra to immediately reinstate Ratliff, with the same hours of work, rate of pay, and benefits received.

Cobra next sought Commission review of the Reinstatement Order, specifically challenging the ALJ's analysis of the tolling issue. By its February 28, 2013 Decision (the "Commission Decision"), the Commission granted review but affirmed the Reinstatement Order.[4] On March 27, 2013, Cobra timely filed the underlying petition for review, summarily asserting jurisdiction under the collateral order doctrine and contending that the Commission erroneously denied Cobra's tolling defense.

## II.

Although Rule 28(a)(4) of the Federal Rules of Appellate Procedure requires that an opening appellate brief contain a detailed jurisdictional statement, both parties gave short shrift to the asserted basis for appellate jurisdiction in this

---

[4] The Commission Decision is found at J.A. 237-43.

matter.[5] As a result, prior to oral argument, we obtained supplemental briefing on the jurisdiction question. Therein, both parties once again summarily urged us to accept jurisdiction under the collateral order doctrine.[6] Nevertheless, "we are obliged to satisfy ourselves of subject-matter jurisdiction, even where the parties concede it." United States v. Urutyan, 564 F.3d 679, 684 (4th Cir. 2009) (citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986)). Mindful of our obligation with respect to jurisdiction, we must assess whether the Commission Decision is reviewable.

A.

Section 106(a)(1) of the Mine Act authorizes "any person adversely affected or aggrieved by an order of the Commission" to seek review in the court of appeals for the circuit in which the underlying statutory violation is alleged to have occurred.

---

[5] The Secretary, who briefed and argued this matter on behalf of the Respondents, agrees with Cobra that we possess jurisdiction under the collateral order doctrine. The Commission, electing not to participate as an active litigant in this proceeding, did not file a brief or participate in oral argument. As it advised the Court, the Commission "remains a respondent and will monitor the litigation."

[6] In responding to our Order of October 15, 2013, directing supplemental briefing on jurisdiction, the Secretary simply referred us, in order "to avoid unnecessary repetition," to the summary jurisdictional statement in her opening brief. Put mildly, we were surprised and somewhat baffled by that submission.

7

See 30 U.S.C. § 816(a)(1). Although the Act uses the term "order" rather than "final order," we have recognized that only a final Commission order is entitled to review in this Court. See Monterey Coal Co. v. FMSHRC, 635 F.2d 291, 292-93 (4th Cir. 1980); see also Bell v. New Jersey, 461 U.S. 773, 778-79 (1983) ("The strong presumption is that judicial review will be available only when agency action becomes final.").

The collateral order doctrine was first identified in 1949 in Cohen v. Beneficial Industrial Loan Corp., where the Supreme Court recognized a "small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." 337 U.S. 541, 546 (1949).[7] The Cohen approach,

---

[7] Our dissenting colleague maintains that the Commission Decision was a final order for purposes of 30 U.S.C. § 816(a)(1), such that we may assume jurisdiction over Cobra's petition without resort to the collateral order doctrine. In support of that assertion, the dissent relies only on some dicta from other circuits. The dissent's position conveniently ignores our own precedent, which establishes that an agency order is not final if it is a "preliminary step in the final disposition of [the] case on its merits." See Monterey Coal, 635 F.2d at 293. That the Commission Decision is just such a "preliminary step" is evident from § 815(c) of the Mine Act, which provides for a miner's reinstatement "pending final order on the complaint." This plain language, viewed within the structure of the Mine Act, shows in a clear, compelling manner that a temporary reinstatement award is simply interlocutory, (Continued)

8

limiting collateral order review only to certain exceptional cases, retains its validity today. Distilling Cohen and its progeny, the Court requires that an appealable collateral order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." Will v. Hallock, 546 U.S. 345, 349 (2006) (alterations in original) (internal quotation marks omitted); see also Al Shimari v. CACI Int'l, Inc., 679 F.3d 205 (4th Cir. 2012) (en banc) (rejecting collateral order jurisdiction over, inter alia, law of war defense).

The three requirements for collateral order jurisdiction are necessarily stringent, and the Supreme Court has emphasized that the doctrine must "never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." See Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868 (1994). On this point, the Court has been consistently unequivocal. As Justice Souter stressed in Will:

---

and that the "final order" will be entered subsequently. Finally, the dissent stands alone in its characterization of a temporary reinstatement award as a final order: all the parties here, as well as every court of appeals to consider the issue, agree that appellate jurisdiction in such a situation must derive — if at all — from the collateral order doctrine.

9

> [W]e have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope. <u>And we have meant what we have said</u>; although the court has been asked many times to expand the small class of collaterally appealable orders, we have instead kept it <u>narrow and selective</u> in its membership.

546 U.S. at 350 (emphasis added) (internal quotation marks omitted).  The Court's admonitions respecting the limited scope of the collateral order doctrine "reflect[] a healthy respect for the virtues of the final-judgment rule."  <u>Mohawk Indus., Inc. v. Carpenter</u>, 558 U.S. 100, 106 (2009).[8]  Our distinguished former colleague Judge Williams urged caution in applying the collateral order doctrine to administrative decisions, reminding us that "[i]t is not the place of appellate courts to scrutinize agency action at every step. . . . Rather, [we] must proceed cautiously, allowing lower decision-makers thoroughly to resolve the intricacies of underlying claims."  See <u>Carolina Power &</u>

---

[8] Our good dissenting colleague blithely proceeds as if the most recent two decades of Supreme Court jurisprudence on the collateral order doctrine never existed.  Overlooking the Court's explicit instructions to limit application of the collateral order doctrine — see <u>Will</u>, 546 U.S. at 350 ("And we have meant what we have said") — the dissent would casually create, under the collateral order doctrine, an entirely new category of appealable non-final orders.  The inescapable result of its position is that the scope of collateral order jurisdiction in administrative agency cases would be dramatically expanded.  Such an expansion would constitute an unjustifiable rejection of the Court's decisions in <u>Digital Equipment</u>, <u>Will</u>, and <u>Mohawk</u>.

10

Light Co. v. U.S. Dep't of Labor, 43 F.3d 912, 918 (4th Cir. 1995).[9]

In delineating the boundaries of the collateral order doctrine, "'the importance of the right asserted [on appeal] has always been a significant part'" of the analysis. See Will, 546 U.S. at 352 (quoting Lauro Lines s.r.l. v. Chasser, 490 U.S. 495, 502 (1989) (Scalia, J., concurring)).[10] As the Supreme Court recently explained, the traditional importance requirement "finds expression" in both the second and third prongs of the

---

[9] We observe that the Secretary's expansive view of collateral order jurisdiction in this proceeding, in addition to flouting the Supreme Court's admonitions, is a sharp turn from the position taken by the Department of Justice as amicus curiae in our recent en banc decision in Al Shimari. There, the DOJ relied substantially on Mohawk and Digital Equipment — decisions the Secretary failed to mention here, even in its supplemental brief on jurisdiction — and stressed the narrow scope of the collateral order doctrine. See Br. of the United States as Amicus Curiae, Al Shimari v. CACI Int'l, Inc., No. 09-1335 (4th Cir. Jan. 14, 2012), ECF No. 146.

[10] For several years we appear to have identified a fourth collateral order requirement: that the order "present a serious and unsettled question on appeal." See, e.g., Carolina Power, 43 F.3d at 916. Later, in Under Seal v. Under Seal, we articulated the three-part test most frequently employed by the Supreme Court. See 326 F.3d 479, 483 (4th Cir. 2003). This semantic shift did not at all abandon the "importance" aspect to which Justice Scalia refers; the decision simply reorganized it. More recent Supreme Court decisions have reemphasized that collateral order jurisdiction remains reserved for exceptional cases only, where "the justification for immediate appeal [is] sufficiently strong to overcome the usual benefits of deferring appeal until litigation concludes." See Mohawk, 558 U.S. at 107.

three-part test.  See Mohawk, 558 U.S. at 107.  The second prong insists, quite clearly, on "important questions separate from the merits."  Id. (internal quotation marks omitted).  And "more significantly," the third prong — whether a right is "effectively unreviewable" on appeal from a final judgment — requires careful judicial balancing that takes into account the importance of the issue the appellate court might review.  See id.

In assessing whether we possess jurisdiction under the collateral order doctrine, "we do not engage in an 'individualized jurisdictional inquiry.'"  See Mohawk, 558 U.S. at 107 (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 473 (1978)).  That is, our focus is not on the particular order at issue, but rather on the "entire category" of orders to which it belongs.  See Digital Equip., 511 U.S. at 868.  Thus, the chance that "the litigation at hand might be speeded" or "a particular injustice averted" by an immediate appeal does not provide a basis for jurisdiction under the collateral order doctrine.  Id. (internal quotation marks omitted).

B.

Having identified some controlling principles, we restate the jurisdictional issue:  whether a Commission decision granting temporary reinstatement to a coal miner is immediately appealable by the coal operator under the collateral order

doctrine.  Although this issue is one of first impression in our circuit, two of our sister courts of appeals have confronted the question and concluded that appellate jurisdiction is appropriate.  Those decisions, however, are of limited persuasive effect.  The Eleventh Circuit's decision in Jim Walter Resources, Inc. v. FMSHRC, 920 F.2d 738 (11th Cir. 1990), was rendered more than two decades ago, prior to the Supreme Court's more recent, emphatic warnings — made in its Digital Equipment, Will, and Mohawk decisions — concerning the narrow and limited scope of the collateral order doctrine.  The Seventh Circuit addressed the issue more recently, but resolved the jurisdictional inquiry in a somewhat cursory fashion.  See Vulcan Constr. Materials, L.P. v. FMSHRC, 700 F.3d 297, 300 (2012) (concluding in single paragraph that collateral order requirements were satisfied).  As a result, those decisions fail to convince us of the proper jurisdictional course, or even inform our analysis.  Instead, we will assess for ourselves the requirements of the collateral order doctrine and resolve the jurisdictional question presented in this proceeding.[11]

---

[11] The dissent identifies other decisions where the two judges in this panel's majority argued against the creation of a circuit split.  For example, in Wachovia Bank v. Schmidt, I dissented, arguing that the "creation of a circuit split" concerning the corporate citizenship of national banks was erroneous and "unwarranted."  See 388 F.3d 414, 439 (4th Cir. 2004) (King, J., dissenting).  Our good dissenting colleague (Continued)

13

1.

The collateral order doctrine first requires that a putatively appealable order conclusively determine a disputed question. This "most basic element" is sometimes presumed satisfied so long as the district court (or federal agency) has decided the matter presented on appeal. See 15A Charles Alan Wright et al., Federal Practice and Procedure § 3911.1 (2d ed. 1992). Nonetheless, there is little justification for authorizing an immediate appeal under the collateral order doctrine if there is a "plain prospect" that the lower court could alter its own ruling. See FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 407 (1st Cir. 1987) (internal quotation marks omitted). Clearly, if a court or agency expressly holds open the possibility of reconsideration, a collateral order appeal should not be authorized. See Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 42 (1995) (declining collateral order jurisdiction where district court expressly "planned to

here neglects to explain that the Supreme Court ultimately agreed with my dissent in the Wachovia Bank case, unanimously and unceremoniously reversing the decision of the Wachovia majority. See Wachovia Bank v. Schmidt, 546 U.S. 303 (2006). Put simply, there is nothing wrong with creating a circuit split when it is justified. At the end of the day, justice is served by reaching the correct result.

reconsider its ruling" on qualified immunity); see also Jamison v. Wiley, 14 F.3d 222, 230 (4th Cir. 1994) (explaining that "a tentative and preliminary ruling . . . which plainly holds open the prospect of reconsideration" is not subject to collateral order jurisdiction).

Both Cobra and the Secretary, relying on the Jim Walter Resources opinion, maintain that a Commission order awarding temporary reinstatement is "a fully consummated decision," with "literally no further steps that [an operator] can take to avoid the Commission's order at the agency level." See 920 F.2d at 744 (internal quotation marks omitted). Although such an assertion might have been correct more than twenty years ago when Jim Walter Resources was rendered, it is inaccurate today, thanks to the tolling defense at the heart of Cobra's petition. Pursuant to the Commission's 2009 ruling in its Gatlin case, a coal operator is entitled, prior to an ALJ's decision on the merits, to seek modification of a temporary reinstatement award on the basis of "a change of circumstances," such as a subsequent large-scale reduction-in-force. See Sec'y on behalf of Gatlin v. KenAmerican Resources, Inc., 31 FMSHRC 1050, 1054 (2009). Indeed, the Commission Decision expressly acknowledged that proposition, recognizing "the possibility that there may be circumstances in which [the ALJ], prior to the hearing on the

15

merits, may appropriately order an intermediate hearing regarding changed circumstances." Commission Decision 5 n.3.

Inasmuch as an order of temporary reinstatement remains subject to modification during the pendency of a coal miner's discrimination complaint, such an order can hardly be characterized as a conclusive determination. In the volatile coal mining industry, the prospect that a mine could be idled or a major layoff occur provides little support for expending the time and resources of an appellate court on tentative or non-final agency decisions. And, as the Commission Decision demonstrates, a ruling on temporary reinstatement can be expressly held open for the possibility of reconsideration. Accordingly, an interlocutory Commission ruling awarding temporary reinstatement to a coal miner such as Ratliff fails to satisfy the initial requirement of the collateral order doctrine.[12]

---

[12] If an interlocutory order from which a collateral order appeal is sought "fails to satisfy any [of the three] requirements, it is not an immediately appealable collateral order." S.C. State Bd. of Dentistry v. FTC, 455 F.3d 436, 441 (4th Cir. 2006) (internal quotation marks omitted). Nonetheless, we are satisfied in this proceeding to also consider the other collateral order requirements, as they are independent alternative grounds for dismissal of Cobra's petition for appeal. See Dickens v. Aetna Life Ins. Co., 677 F.3d 228, 233-34 (4th Cir. 2012) (addressing all three collateral order requirements and declining jurisdiction where two were not satisfied).

16

Second, an appealable collateral order must also "resolve an important issue completely separate from the merits of the action." Will, 546 U.S. at 349. This aspect of the collateral order doctrine has two subparts: the importance aspect and the separability aspect. Because importance is a "more significant[]" part of the third collateral order requirement, we focus here on whether the issue before the Commission in assessing a miner's application for temporary reinstatement is sufficiently distinct from the merits of the miner's discrimination claim. See Mohawk, 558 U.S. at 107.

We have consistently held "that the 'issues raised in an interlocutory appeal need not be identical to those to be determined on the merits to fail under [the second] requirement; only a threat of substantial duplication of judicial decision making is necessary.'" Dickens v. Aetna Life Ins. Co., 677 F.3d 228, 233 (4th Cir. 2012) (alteration in original) (quoting S.C. State Bd. of Dentistry v. FTC, 455 F.3d 436, 441 (4th Cir. 2006)). Expressed differently, "[a]n order is only 'collateral' to the merits of a case if it does not 'involve considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Bd. of Dentistry, 455 F.3d at 441 (quoting Coopers & Lybrand, 437 U.S. at 469).

17

Both Cobra and the Secretary rely on Jim Walter Resources in maintaining that, although the temporary reinstatement analysis "necessarily entail[s] some consideration of the factual allegations in the miner['s] complaint[]," it is "conceptually distinct from a decision on the ultimate merits." See Jim Walter Res., 920 F.2d at 744. The substance of this asserted distinction seems to be that "[t]he temporary reinstatement hearing merely determine[s] whether the evidence mustered by the [miner] to date establishe[s] that [his complaint is] nonfrivolous, not whether there is sufficient evidence of discrimination to justify permanent reinstatement." Id. As a result, the parties contend, a temporary reinstatement order is adequately separable from the miner's discrimination claim itself.

The parties have substantially overstated the distinction between temporary and permanent relief in a coal miner's discrimination proceeding. There is, no doubt, a different evidentiary burden at each stage: a coal miner applying for temporary reinstatement need not prove a prima facie case of discrimination, but must only produce some evidence of "protected activity, adverse action, and a nexus between the two." See Sec'y on behalf of Stahl v. A&K Earth Movers, Inc., 22 FMSHRC 323, 326 (2000). Thus, an analysis under that lenient standard differs, to some extent, from that which the ALJ must

18

undertake following a full hearing on the merits. From a practical standpoint, however, a temporary reinstatement analysis is simply a highly deferential look at the same basic facts and factors that ultimately control the outcome of the miner's claim. Consider the Commission's own guidance: in reviewing an application for temporary reinstatement, "it is useful to review the elements of a discrimination claim in order to assess whether the evidence . . . meets the non-frivolous test." See Sec'y on behalf of Williamson v. CAM Mining, LLC, 31 FMSHRC 1085, 1088 (2009).

There is simply no doubt that, regardless of any "conceptual" difference, the considerations involved in the temporary reinstatement process are deeply enmeshed with the factual and legal issues comprising the miner's underlying discrimination claim. Accordingly, an order awarding temporary reinstatement plainly fails this aspect of the second requirement of the collateral order doctrine.

3.

The third and final collateral order requirement is that the order be "effectively unreviewable on appeal from a final judgment." Will, 546 U.S. at 349. An unreviewable order is one that has significant and irreparable effects. See Johnson v. Jones, 515 U.S. 304, 311 (1995) ("significant"); Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 376 (1981)

19

("irreparable"). An order may also be unreviewable if it "affect[s] rights that would be irretrievably lost in the absence of an immediate appeal." See Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 430-31 (1985). But even such irrevocable harm will not alone suffice to trigger collateral order jurisdiction. See Digital Equip., 511 U.S. at 872. Whether an order is effectively unreviewable "simply cannot be answered without a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement" — i.e., an assessment of whether a sufficiently important interest would be imperiled by our refusal to provide an immediate appellate review. See Mohawk, 558 U.S. at 107 (internal quotation marks omitted).

Cobra maintains that the impact of the Commission Decision on temporary reinstatement is significant and irreparable, and that once a final judgment is entered by the Commission, the harm to Cobra will "evaporate" and it will "effectively lose any opportunity for a judicial hearing" of its challenge to the decision. See Jim Walter Res., 920 F.2d at 745.[13] In our view,

_____

[13] Were we to review Cobra's contention without considering the importance issue, we would be ignoring Supreme Court authority. Even when the right asserted in an appeal sought under the collateral order doctrine would be "positively destroyed" by postponing appellate review, the Supreme Court has declined to exercise collateral order jurisdiction on the ground that the right at issue was "not sufficiently important to
(Continued)

20

the central "harm" to a coal operator arising from a temporary reinstatement order is that it must reemploy and pay the coal miner his salary and benefits during the pendency of the administrative proceedings on his discrimination claim.[14] The operator's interest implicated, therefore, is primarily an economic one. We are thus faced with deciding whether that economic interest is sufficiently important to demand the protection of a collateral order appeal.

The Supreme Court has conducted its importance analysis under the third prong of the collateral order doctrine by first combing its precedent to identify recurring characteristics that merit collateral order appealability, and then comparing those characteristics to the proceeding at hand. See Will, 546 U.S.

_____

overcome the policies militating against interlocutory appeals." See Lauro Lines, 490 U.S. at 502-03 (Scalia, J., concurring) ("to make express what seems . . . implicit" in majority's rejection of collateral order jurisdiction over appeal involving contractual "right not to be sued" in particular forum).

[14] The dissent suggests that collateral order jurisdiction is justified by the possibility that a coal operator will sustain substantial non-economic harm as a result of being forced to reinstate a potentially disruptive employee. This assertion is utterly unpersuasive and entirely speculative, in that the miner's reinstatement does not immunize him from the consequences of his future misbehavior. Any legitimate misconduct by a reinstated miner unrelated to whistleblowing activities may justify his dismissal anew. Moreover, as was the case here, the coal operator and the miner may well enter into an agreement where the miner is economically — but not physically — reinstated. See J.A. 228-31.

21

350-54. In Will, the Court examined four of its prior decisions where the interests at issue were found sufficiently important to satisfy the "effectively unreviewable" requirement. See id. In Nixon v. Fitzgerald, involving Presidential immunity, the Court recognized collateral order jurisdiction and identified "compelling public ends" that were "rooted in the constitutional tradition of the separation of powers." See 457 U.S. 731, 758, 770 (1982). In Mitchell v. Forsyth, 472 U.S. 511 (1985), where an order denying qualified immunity to the Attorney General was at issue, the Court held that the denial of such immunity was subject to a collateral order appeal, and "spoke of the threatened disruption of governmental functions, and fear of inhibiting able people from exercising discretion in public service." See Will, 546 U.S. at 352. The importance of a State's dignitary interests steered the analysis of the Eleventh Amendment immunity question in Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139 (1993), where the Court determined that collateral order jurisdiction was properly invoked. And the double jeopardy claim presented in a pretrial appeal justified the application of collateral order jurisdiction in Abney v. United States. See 431 U.S. 651 (1977). The common thread in those cases, according to the

Court, was a "particular value of a high order," or a "substantial public interest." Will, at 352-53.[15]

On the other hand, the Supreme Court has declined to exercise collateral order jurisdiction in putative appeals involving, inter alia:  a pretrial discovery order that rejected a claim of attorney-client privilege (Mohawk); a pretrial order rejecting application of the Federal Tort Claims Act's judgment bar (Will); and a court order declining to enforce a settlement agreement in a trademark case (Digital Equipment).  In each of these decisions, the Court agreed that the interest at stake, although "important in the abstract," failed to justify the cost of expanding the categories of decisions that are appealable under the collateral order doctrine.  See Mohawk, 558 U.S. at 108.

---

[15] The dissent criticizes the panel majority's analysis of the collateral order doctrine's importance requirement, asserting that we are simply "cataloguing cases."  Post at 42. The dissent supports its point, ironically enough, with its own catalog of cases.  See post at 42-43.  A striking distinction between the two catalogs is that the dissent's begins in 1974 and goes back in time to what seems to have been a more permissive jurisdictional era.  Our analysis, on the other hand, subscribes fully to the Supreme Court's more recent precedents, and their narrowing trend concerning application of the collateral order doctrine.  In our view, we are obliged to carefully adhere to the Court's persistent admonitions that a court of appeals should avoid creating new categories of interlocutory appeals under the collateral order doctrine.

In sum, a coal operator's financial interest in avoiding wage payments to a reinstated miner who returns to his job in the coal mines pales in comparison to those interests that have been deemed sufficiently important to give rise to collateral order jurisdiction. Frankly, a coal operator's economic interests do not begin to approach the importance of several interests — such as the attorney-client privilege — that the Supreme Court has deemed insufficient. We readily recognize, of course, that economic harm suffered by a coal operator may sometimes be "imperfectly reparable" on final order review. The collateral order doctrine, however, requires a great deal more. See Mohawk, 558 U.S. 107. In these circumstances, we are unable to conclude that failing to apply the collateral order doctrine to an administrative order temporarily reinstating a coal miner to his job would imperil a "particular value of a high order" or a "substantial public interest." See Will, 546 U.S. at 352-53. Accordingly, the Commission Decision also fails to satisfy the third and final collateral order requirement.

### III.

Pursuant to the foregoing, the collateral order doctrine does not permit an interlocutory review of the proceedings

24

below.  We are therefore bereft of jurisdiction and must dismiss Cobra's petition for review.

<u>PETITION FOR REVIEW DISMISSED</u>

AGEE, Circuit Judge, dissenting:

I respectfully dissent because we have jurisdiction to consider Cobra's petition for review. Therefore, I would decide this case on its merits and remand to the Commission for further proceedings.

I.

The majority first addresses the collateral order doctrine to find a lack of jurisdiction for appellate review. However, under settled principles regarding administrative agency decisions, the Commission's order is a final, reviewable order, which affords us jurisdiction to hear and decide the petition for review.

The Mine Act gives us jurisdiction to hear appeals from the Commission's orders, so we must look first to the plain text of that statute. See Blitz v. Napolitano, 700 F.3d 733, 740 (4th Cir. 2012) (examining the statute's plain text to determine jurisdiction over administrative appeal). "Any person adversely affected or aggrieved by an order of the Commission under [the Mine Act]" may obtain review. 30 U.S.C. § 816. We have held that the statute affords us jurisdiction only over "final" orders from the Commission. See Eagle Energy, Inc. v. Sec'y of Labor, 240 F.3d 319, 323 (4th Cir. 2001).

26

Without question, the Commission issued an "order" in this case. Our task is to determine whether that order qualifies as "final," so as to establish our authority to review it under Section 816.

To determine whether an agency's action warrants review as a "final order," we ask two questions.[1] First, we consider whether the decision "mark[s] the consummation of the agency's decisionmaking process." Golden & Zimmerman, LLC v. Domenech, 599 F.3d 426, 432 (4th Cir. 2010) (emphasis omitted). Second, we examine whether the "action [is] one by which rights or obligations have been determined or from which legal consequences will flow." Id. (emphasis omitted). In some instances, we have rephrased these two questions as four: "(1) is the agency action a definitive statement of the agency's position; (2) does the action have direct and immediate legal force requiring parties' immediate compliance with the agency's pronouncement; (3) do the challenges to the agency's actions involve legal issues fit for judicial resolution; and (4) would immediate judicial review speed enforcement and promote judicial

---

[1] We use these factors most often in Administrative Procedure Act cases, which involve review of "final agency action." But the principles apply to "final orders" as well. See, e.g., U.S. W. Commc'ns, Inc. v. Hamilton, 224 F.3d 1049, 1054-55 (9th Cir. 2000); Meredith v. FMSHRC, 177 F.3d 1042, 1047 (D.C. Cir. 1999).

efficiency?"  Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA, 313 F.3d 852, 858 (4th Cir. 2002).[2]

When these questions are asked and answered, our traditional administrative finality standards show that we have jurisdiction over Cobra's appeal of the temporary reinstatement order.[3]

A.

The Commission's order marks the end of the decisionmaking process for purposes of the temporary reinstatement issue. Nothing more is before the Commission regarding that order, and

---

[2] We do not consider two factors.  First, "[a] final order need not necessarily be the very last order.  Courts often review agency orders issued pending further proceedings especially where, as here, the agency's action/inaction could not be challenged in any subsequent proceeding." NetCoalition v. SEC, 715 F.3d 342, 351 (D.C. Cir. 2013) (internal marks and citations omitted).  Second, we focus "not on the label attached to the action[,] but on the nature of the action." 1000 Friends of Md. v. Browner, 265 F.3d 216, 224 (4th Cir. 2001).

[3] In considering its jurisdiction to hear a petition for review from a Mine Act temporary reinstatement order, the Eleventh Circuit noted that such orders are likely final and reviewable.  See Jim Walter Res., Inc. v. FMSHRC, 920 F.2d 738, 744 (11th Cir. 1990) ("Thus, the policies that underlie the provision for review of district court orders affecting preliminary injunctive relief in 28 U.S.C. § 1292(a)(1) are applicable here and suggest that temporary reinstatement orders should be reviewable.").  Ultimately, that court did not decide the issue because the collateral order doctrine "directly" granted the court jurisdiction even if the order under review were not otherwise deemed "final." Id.

Cobra cannot take any further steps within the administrative process to challenge it.  See Monterey Coal Co. v. FMSHRC, 635 F.2d 291, 293 (4th Cir. 1980) (relying in part on party's failure to "exhaust[] its administrative remedies" in finding that Mine Act order was not a reviewable "final order").[4]

The majority notes that the Commission observed that Cobra might seek relief from the reinstatement order if circumstances were to change.  Then, the majority posits that the "volatile" mining industry could provide such changed circumstances, and, therefore, the temporary reinstatement order cannot be "final" in a jurisdictional sense.

This prospect of reconsideration does not render the Commission's order non-final because it is so inherently

---

[4] Contrary to the majority's characterization, Monterey Coal does not decide the finality issue.  In that case, we held that an order of the Commission remanding to the ALJ was not a final, reviewable order.  Monterey Coal, 635 F.2d at 292-93.  We reached that decision because the challenged order was only a "preliminary step in the final disposition of this case on its merits."  Id. at 293.  In contrast, the temporary reinstatement order at issue here stands separate and apart from the merits of the case.  Although the length of the reinstatement period is affected by the ultimate outcome of the case, the temporary reinstatement order itself has no substantive impact on the ultimate disposition.  And, importantly, in Monterey Coal, the subject of the ALJ order would have been fully reviewable in a final Commission order.  The direct opposite is the case here, as the payment and employment actions under the temporary reinstatement order cannot be reversed by a final order on the merits for the period of time covered by the temporary reinstatement order.  Therefore, the order here cannot be the type of "preliminary step" addressed in Monterey Coal.

29

speculative. Further, the prospect finds no support in the record. The Commission recognized its power to reconsider in limited circumstances, but did not announce any intention to actually exercise that power in this case. And importantly, courts generally will review a decision even if unknown future changed circumstances could affect it. See, e.g., Wis. Pub. Power, Inc. v. FERC, 493 F.3d 239, 266 (D.C. Cir. 2007); City of Tacoma, Wash. v. FERC, 331 F.3d 106, 113 (D.C. Cir. 2003); Sierra Club v. U.S. Nuclear Regulatory Comm'n, 862 F.2d 222, 225 (9th Cir. 1988). Were it otherwise, the possibility of reconsideration would defeat our jurisdiction in most every case, agency and non-agency cases alike. For example, in cases appealed from federal district court, the district court can often revisit the order under review -- perhaps after a party moves for relief under Federal Rules of Civil Procedure 59 or 60. However, we have never allowed that speculative possibility to defeat our jurisdiction to review an otherwise final order.

B.

The Commission's order also has a direct and immediate effect because Cobra must allow Ratliff to go back to work now. There is no intermediate or additional step that would delay the full force and effect of the temporary reinstatement order. Indeed, at least one court has compared the temporary

30

reinstatement order to a preliminary injunction. See Jim Walter Res., 920 F.2d at 744. This close relationship between the temporary reinstatement order and a preliminary injunction might sustain jurisdiction in and of itself. See, e.g., Shoreham-Wading River Cent. Sch. Dist. v. U.S. Nuclear Regulatory Comm'n, 931 F.2d 102, 105 (D.C. Cir. 1991); Massachusetts v. U.S. Nuclear Regulatory Comm'n, 924 F.2d 311, 322 (D.C. Cir. 1991); Nev. Airlines, Inc. v. Bond, 622 F.2d 1017, 1020 & n.5 (9th Cir. 1980).

## C.

Third, this appeal presents legal issues that courts can resolve. One issue presents a straightforward legal question about the burden of proof. The other constitutes a common substantial evidence challenge. See, e.g., NLRB v. M&B Headwear Co., 349 F.2d 170, 171 (4th Cir. 1965) (stating that a "substantial evidence" challenge presented a "familiar question"). We do not improvidently trespass upon the agency's province when it comes to legal questions like these, especially when, as here, the agency concedes that we possess jurisdiction and asks us to hear the appeal on its merits. See 16 Charles Alan Wright, et al., Federal Practice and Procedure § 3942 (2d ed. 2013 supp.) ("If . . . the agency itself desires present review, there is little need for concern that review is a

31

judicial intrusion into the agency's capacity to manage the course of its own proceedings.").

## D.

Finally, immediate review would speed enforcement and promote judicial efficiency. Exercising review would not slow Ratliff's benefits because he has received those benefits from the time the ALJ entered his order; however, an immediate appeal would hasten review of alleged errors in the administrative process. That review would bring certainty to a standard that the Commission now employs in other temporary reinstatement cases. See, e.g., Sec'y of Labor ex rel. Rodriguez v. C.R. Meyer & Sons Co., No. 2013-618-DM, 2013 WL 2146640, at *3-4 (F.M.S.H.R.C. May 10, 2013).

Immediate review would also avoid creating an unreviewable harm. Cobra's claims will be unreviewable absent immediate appeal because the issue of temporary reinstatement will be moot by the time the parties resolve the full merits proceeding. As a result, we will never review the Commission's use of the temporary reinstatement standards. That administrative immunity conflicts with the "'strong presumption' in favor of judicial review of agency action." Speed Mining, Inc. v. FMSHRC, 528 F.3d 310, 316 (4th Cir. 2008) (quoting Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986)).

32

By refusing to review these kinds of orders, we will cause irreparable harm to both sides. A mine operator will have no opportunity to seek review should the Commission order the operator to pay wages to a miner not entitled to them. The operator will never obtain reimbursement of those wages, no matter how wrong or irresponsible an erroneous decision was to award them. As counsel for the Secretary conceded, no procedure exists that allows an operator to recoup wages paid to a temporarily reinstated miner for all periods before a final merits decision. Although the majority labels this harm "economic" or "financial," "[a] threat of economic injury has always been regarded as sufficient . . . for the purpose of finding an order final and reviewable." Envtl. Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 592 (D.C. Cir. 1971); see also Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agric., 197 F.3d 448, 452 (10th Cir. 1999) ("Our inquiry into harm takes into account financial . . . consequences flowing from the agency action.").

An operator's harm stems not just from the wages paid. Without an immediate appeal, mine operators will also have no way to cope with erroneous decisions that could disrupt the workplace. In the present case, for instance, the ALJ and Commission forced Cobra to reinstate a miner at full pay who allegedly engaged in disruptive acts such as fighting and

33

yelling profanity.  Reinstating that kind of an employee can damage the workplace.[5]  See, e.g., NLRB v. Longview Furniture Co., 206 F.2d 274, 275-76 (4th Cir. 1953) (describing the disruptive effect of a court order that forces an employer to reinstate an employee who has "use[d] profane and indecent language").  Despite this harm, a mine operator now has no judicial remedy to correct a mistaken agency decision below.

Furthermore, a miner's appeal from an adverse decision on temporary reinstatement will also now be foreclosed because the mine operator and the miner share equal appeal rights.  See, e.g., Meredith, 177 F.3d at 1048 (explaining that Mine Act's review provision would apply identically to all persons, as the legislative history counseled a uniform approach).  A future miner could very well suffer irreparable harm from not receiving needed wages in the interim period before a final merits decision.  Moreover, as the Secretary has warned, that harm could defeat the Mine Act's enforcement mechanisms and, in turn, the Congressional intent in adopting this legislation.  See S. Rep. No. 95-181, at 37 (1977) ("[T]emporary reinstatement is an

---

[5] This disruption stems not just from the potential that the employee will repeat his conduct in the future, but also from the actual act of reinstating him in the first instance.  See Longview Furniture, 206 F.2d at 276 ("The employment of persons who have been guilty of such conduct toward their fellow employees has a disruptive effect on the employer's business as a result of the feelings and antagonisms thereby engendered.").

34

essential protection for complaining miners who may not be in the financial position to suffer even a short period of unemployment or reduced income pending resolution of the discrimination complaint.").

E.

The Seventh Circuit's decision in Finer Foods, Inc. v. United States Department of Agriculture, 274 F.3d 1137 (7th Cir. 2001), represents in an analogous agency setting the resolution of the jurisdictional issue using the same inquiry just completed. In Finer Foods, the court faced an appeal from (a) an administrative order, (b) implementing immediate injunctive relief, (c) against a private party, (d) pending an agency investigation and proceedings, (e) for an alleged statutory violation. The agency there contended that the court could not review the order because the agency had not completed all its proceedings related to the violation underlying the immediate relief. Id. at 1139. The Seventh Circuit deemed the agency's argument "frivolous" and said it was "surprised and disappointed" to see the argument made at all. Id. at 1138-39.

We could, and should, end the jurisdictional analysis here, as the temporary reinstatement order at issue is, under settled administrative agency jurisprudence, a final order for purposes of appeal. The majority, however, looks to the collateral order

35

doctrine.  Because the Commission's order is reviewable on appeal even under the collateral order doctrine, I address that issue as well.

II.

The collateral order doctrine describes "that small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  Al Shimari v. CACI Int'l, Inc., 679 F.3d 205, 213 (4th Cir. 2012).  To qualify as a collateral order under § 1291, a district court decision must "'[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment.'"[6]  Dickens v. Aetna Life Ins. Co., 677 F.3d 228, 233 (4th Cir. 2012) (quoting Will v. Hallock, 546 U.S. 345, 349

---

[6] The Supreme Court has applied these factors in cases favored by the majority.  See Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 106 (2009); Will, 546 U.S. at 349; Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 867 (1994). Therefore, faithful adherence to the three-factor test ensures that the doctrine is used in only narrow circumstances.  That narrow application in turn respects the Supreme Court's recent admonitions to apply the doctrine sparingly.

(2006)).  Some of these factors overlap with the questions just asked and answered in the administrative finality inquiry.

As in the administrative finality context, the collateral order factors indicate that we have jurisdiction.  The only two other circuit courts of appeal to have considered the issue reached the same conclusion.[7]  See Vulcan Constr. Materials, L.P. v. FMSHRC, 700 F.3d 297, 300 (7th Cir. 2012); Jim Walter Res., Inc., 920 F.2d at 744-45.

A.

First, the Commission's order here conclusively resolved the issue.  Nothing more is to be done before the agency and no further issues pertaining to temporary reinstatement remain to be resolved by it.  The temporary reinstatement order is a final and complete agency disposition of the discrete controversy before it.  Accord Vulcan Constr. Materials, 700 F.3d at 300; Jim Walter Res., Inc., 920 F.2d at 743.

The majority treats the order as inconclusive because the potential for changed circumstances might allow the Commission

---

[7] Though two courts addressed this issue directly, a third court heard an appeal from a temporary reinstatement order without commenting on jurisdiction.  See N. Fork Coal Corp. v. FMSHRC, 691 F.3d 735 (6th Cir. 2012).  We should not "disregard the implications of an exercise of judicial authority assumed to be proper in previous cases."  Washlefske v. Winston, 234 F.3d 179, 183 (4th Cir. 2000) (internal marks omitted).

to reopen the issue. Nevertheless, an order can be conclusive even if there is some possibility that the tribunal below will reconsider. See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12-13 (1983); accord United States v. Ochoa-Vasquez, 428 F.3d 1015, 1025 n.7 (11th Cir. 2005); Burns v. Walter, 931 F.2d 140, 145 (1st Cir. 1991); Ortho Pharm. Corp. v. Sona Distribs., 847 F.2d 1512, 1515 (11th Cir. 1988); In re Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1118 (7th Cir. 1979); see also 15A Charles Alan Wright, et al., Federal Practice and Procedure § 3911 (2d ed. 2013 supp.) ("The bare fact that the court has power to change its ruling, however, does not preclude review. It is enough that no further consideration is contemplated.").

A possibility of reconsideration presents a different situation than those described in other decisions -- like those that the majority cites -- that deemed orders inconclusive. In those cases, the decisionmakers expressly indicated that they would revisit the matter later, regardless of whether circumstances changed before that later reconsideration. See, e.g., Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 42 (1995) ("The District Court planned to consider its ruling . . . before the case went to the jury."); Jamison v. Wiley, 14 F.3d 222, 230 (4th Cir. 1994) (finding order inconclusive where district court "made clear that its decision . . . was a tentative one, made

38

only to return things to the status quo . . ., and that it might well change its mind . . . after the evidentiary hearing"). In contrast, neither the ALJ nor the Commission indicated a plan to return to this issue in Ratliff's case. The ALJ spoke in unequivocal terms and ordered Cobra to provide "immediate reinstatement" to Ratliff.

B.

The Commission's order also stands separate from the merits. The seminal collateral order doctrine case, Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546 (1949), explained that an order is "separate" if it "did not make any step toward final disposition of the merits of the case and will not be merged in final judgment." Id.

The Commission's temporary reinstatement decision has no bearing on the later steps in resolving Ratliff's employment status; the case will proceed regardless of whether the miner is reinstated. On the merits, the case below can continue during the pendency of this appeal because nothing decided in adjudicating temporary reinstatement will affect the merits decision. That ability to continue indicates that the order under review is "collateral." See Johnson v. Jones, 515 U.S. 304, 311 (1995).

39

The temporary reinstatement order does not merge with the final order on Ratliff's status because any issues related to the temporary order would be effectively moot by that point. The mine operator cannot then recover any erroneously awarded wages, nor cure the workplace disruption that the reinstated miner caused. Cf. Palmer v. City of Chicago, 806 F.2d 1316, 1319 (7th Cir. 1986) (noting that irreparable harm would result if party did not receive immediate review of fee award, as fees could "disappear into insolvent hands"). Conversely, the miner erroneously denied temporary reinstatement cannot overcome his financial vulnerability occurring before an eventual final reinstatement order on the merits. See, e.g., Edwards v. Director, Office of Workers' Comp. Programs, 932 F.2d 1325, 1327-28 (9th Cir. 1991) (holding that statute's anticipation of immediate relief for financial vulnerable worker called for collateral order review of order denying that relief); Rivere v. Offshore Painting Contractors, 872 F.2d 1187, 1190 (5th Cir. 1989) (same).

The majority believes the Commission's order is not separate because we must consider some of the same facts at this stage as we would at the merits stage. However, the Supreme Court accepts some "factual overlap" in the collateral order context. See, e.g., Mitchell v. Forsyth, 472 U.S. 511, 528-29 (1985) ("[T]he Court has recognized that a question of immunity

40

is separate from the merits of the underlying action for purposes of the Cohen test even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue."). Double jeopardy and qualified immunity collateral appeals most always involve a consideration of many of the same facts that would be determinative on the merits, yet we hear those cases nonetheless. Id. at 529 n.10. Likewise, when a Congressman wished to appeal an order denying him the protection of the Constitution's Speech and Debate Clause, the Supreme Court explained that he should have invoked the collateral order doctrine. Helstoski v. Meanor, 442 U.S. 500, 508 (1979). The Court did so even though the Congressman's defense would necessarily require the Court to consider some of the same facts in the underlying case, including the nature of the acts for which the Congressman faced potential criminal liability. If the Supreme Court wished to avoid any consideration of any of the facts going to the underlying dispute, it would not have applied the collateral order doctrine in such cases.

## C.

Finally, this case involves unreviewable and important interests. An interest is "important" if it is "weightier than the societal interests advanced by the ordinary operation of

41

final judgment principles." Digital Equip. Corp., 511 U.S. at 879. The interests implicated by this case are appropriately recognized as important.

A mine operator appeals a temporary reinstatement order because it faces the prospect of paying unjustified money to a miner, reinstating a problematic worker, or facing legally unsustainable procedures below. Where the miner appeals,[8] he wishes to vindicate his right to much-needed contemporary payment and a fair process below. If a miner doubts that an ALJ will order his immediate reinstatement after an employer retaliatorily terminates him, then the miner will hesitate to make safety complaints and risk termination.

Thus, a Mine Act temporary reinstatement appeal raises important systemic issues about the balance between aggressive safety enforcement, which supports reinstatement, and the rights of the employer to define its workforce, which may counterbalance reinstatement. The Supreme Court has observed that "[w]here statutory . . . rights are concerned, irretrievable loss can hardly be trivial." Digital Equip. Corp., 511 U.S. at 879 (internal marks omitted).

---

[8] We must consider the interests of the miner in a temporary reinstatement proceeding because the Supreme Court has instructed us to look to "the entire category [of cases] to which a claim belongs." Digital Equip. Corp., 511 U.S. at 868.

In contrast, the interests that normally counsel for deferred review are not as strong. The underlying case is not delayed by resolution of the temporary reinstatement order appeal. Review does not impose significant costs. In so much as the temporary reinstatement decision has no impact on the later stages of Ratliff's case, our decision cannot be expected to create incoherence in the proceedings. And our decision will impact this case and future cases like it.

The majority evaluates the interests at stake in this case by comparing them to a catalog of previous collateral order doctrine cases. Cataloguing cases presents an inadequate measure of "importance," as is well illustrated by noting the number of collateral order cases that the majority neglected to examine and which permitted appellate review. Indeed, several Supreme Court cases applied the collateral order doctrine to review collateral orders of arguably less importance than the case at bar.[9] See, e.g., Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 172 (1974) (order that 90% of class action notice costs be

---

[9] To list such cases is not to suggest that cataloguing is the right approach. This list reveals the deficiencies in the majority's application of its chosen approach even assuming that the approach were the correct one. And though the majority feels these cases are too old to consider, "[l]ower courts have repeatedly been warned about the impropriety of preemptively overturning Supreme Court precedent." West v. Anne Arundel Cnty., 137 F.3d 752, 760 (4th Cir. 1998). We must account for these cases given that they remain good law.

imposed on one party); <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 309 (1962) (order contemplating future divestiture in antirust action); <u>Stack v. Boyle</u>, 342 U.S. 1, 4 (1951) (order on motion for reduction of bail); <u>Swift & Co. Packers v. Compania Columbiana Del Carbie, S.A.</u>, 339 U.S. 684, 689 (1950) (order dissolving attachment of naval vessel); <u>Cohen</u>, 337 U.S. at 546 (order declining to compel plaintiff in derivative action to post a bond).  These cases often involved "financial interests," and we have also applied the collateral order doctrine in cases involving such interests.  <u>See, e.g.</u>, <u>In re Looney</u>, 823 F.2d 788, 791 (4th Cir. 1987) (applying collateral order doctrine to order extending automatic stay in bankruptcy case).

The majority cites the issue of attorney-client privilege as an example of a "more important" issue that the Supreme Court has declined to consider under the collateral order doctrine. However, the Supreme Court did not reject collateral review of attorney-client privilege-related orders because those orders were unimportant.  Instead, the attorney-client privilege order was not immediately appealable because the aggrieved party had a variety of other options available by which it could safeguard its rights.[10]  <u>See</u> <u>Mohawk Indus.</u>, 558 U.S. at 108 ("Because . . .

---

[10]  A post-judgment appeal, for instance, could remedy the effect of an improper disclosure at trial by "vacating an adverse judgment and remanding for a new trial."  <u>Mohawk Indus.</u>, (Continued)

44

collateral order appeals are not necessary to ensure effective review of orders adverse to the attorney-client privilege, we do not decide whether the other Cohen requirements are met."); see also id. at 117 (Thomas J., concurring) ("[T]he Court's Cohen analysis does not rest on the privilege order's relative unimportance[.]"). Mohawk Industries and the attorney-client privilege, then, do not offer an appropriate comparison.[11]

---

Inc., 558 U.S. at 109. Alternatively, a party who opposes disclosure could ask for an immediate appeal under 28 U.S.C. § 1292(b). Id. Or it could employ the extraordinary writ of mandamus. Id. None of these options is available to a party involved in a temporary reinstatement proceeding.

[11] The two other "importance" cases cited by the majority are inapposite. Will, 546 U.S. at 354-55, dealt with a statutory judgment defense analogous to res judicata. The Court found that this defense presented no special need for immediate appeal. An order on a routine defense may be easily distinguished from the immediate, injunctive nature of the Commission's temporary reinstatement order here. In Digital Equipment Corp., 511 U.S. at 869, the Court declared that a right embodied in a privately negotiated settlement agreement was not important enough to justify immediate appeal. But the rights and interests implicated in this appeal are rights rooted in a Congressionally enacted statute; those rights could be irretrievably lost absent immediate review. "Where statutory and constitutional rights are concerned, 'irretrievabl[e] los[s]' can hardly be trivial, and the collateral order doctrine might therefore be understood as reflecting the familiar principle of statutory construction that, when possible, courts should construe statutes (here § 1291) to foster harmony with other statutory and constitutional law." Id. at 879.

D.

In view of the foregoing, all the factors in a collateral order doctrine analysis support jurisdiction in the case at bar. I see no basis that merits a circuit split on this issue, especially given that we have warned of the danger of creating circuit splits on matters related to federal rights. See Nat'l Treasury Emps. Union v. FLRB, 737 F.3d 273, 280 (4th Cir. 2013) ("[T]here would be costs in this area to holding differently and creating a circuit split.").

The majority panel has previously recognized the dissonance caused by creating such circuit splits. See, e.g., United States v. Hashime, 722 F.3d 572, 573 (4th Cir. 2013) (Gregory, J., concurring in denial of hearing en banc) (criticizing prior precedent for "creating an oft-dreaded circuit split"); Wachovia Bank v. Schmidt, 388 F.3d 414, 439 (4th Cir. 2004) (King, J., dissenting) (stating that the "creation of a circuit split" on a jurisdictional issue was "unwarranted"), rev'd, 546 U.S. 303 (2006).

III.

Having found jurisdiction, I would remand this matter to the Commission, whose decision below deviated from earlier Commission precedent without adequately articulating a basis for doing so. Furthermore, the Commission appeared to apply a new

46

burden of proof, in the midst of adjudicatory proceedings, without allowing the parties to adjust their case to meet that after-the-fact burden of proof.

## A.

The Commission appears to have applied a new standard of proof to Cobra's economic tolling defense. In earlier Commission cases, "[t]he Commission ha[d] recognized that the occurrence of certain events, such as a layoff for economic reasons, may toll an operator's [temporary] reinstatement obligation." Sec'y of Labor ex rel. Gatlin v. KenAmerican Res., Inc., 31 F.M.S.H.R.C. 1050, 1054 (2009). Mine operators had the burden to establish this tolling defense by a preponderance of the evidence. Id. at 1055. Before the ALJ, both parties and the ALJ relied on the preponderance standard. The parties continued to rely on that standard before the Commission. Nevertheless, the Commission's decision announced a new and unexplained burden of proof. Now, a mine operator must show that it is "frivolous" to say that the subsequent economic condition itself was discriminatory. (J.A. 238-39.)

The Commission may change its benchmark and apply new standards to the tolling defense. See NLRB v. Balt. Transit Co., 140 F.2d 51, 55 (4th Cir. 1944) ("[A]n administrative agency, charged with the protection of the public interest, is

47

certainly not precluded from taking appropriate action . . . because of a mistaken action on its part in the past."). An agency's change in position "does not . . . require greater justification than the agency's initial decision" in every case. Phillip Morris USA, Inc. v. Vilsack, 736 F.3d 284, 290 (4th Cir. 2013). It may be, for instance, that circumstances have changed since the agency last decided the issue and a bona fide rationale exists for the new standard. See In re Permian Basin Area Rate Cases, 390 U.S. 747, 784 (1968) ("[A]dministrative authorities must be permitted . . . to adapt their rules and policies to the demands of changing circumstances.").

However, because changes to existing standards must result from reasoned judgment, the agency must explain a change in course well enough for us to be sure "that such a change in course was made as a genuine exercise of the agency's judgment." Phillip Morris USA, 736 F.3d at 290. "An agency may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy." See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (internal citation omitted). An agency also might need to provide a fuller explanation if "its new policy rests upon factual findings that contradict those which underlay its prior policy." Id. at 515-16. Even if the agency delineates its

48

change-of-course in some rudimentary way, we will still find the change inadequately explained if "its explanation is so unclear or contradictory that we are left in doubt as to the reason for the change in direction." Robles-Urrea v. Holder, 678 F.3d 702, 710 n.6 (9th Cir. 2012); see also Mfrs. Ry. Co. v. Surface Transp. Bd., 676 F.3d 1094, 1096 (D.C. Cir. 2012) (explaining an agency must "persuasively" distinguish precedents).

The Commission did not acknowledge or uphold these responsibilities while shifting course in this case. The Commission's decision references its previous preponderance standard, but then constructs a new standard that pertains to the "objectivity" of the layoff. (J.A. 240.) The Commission at least should explain why that objectivity warrants a higher burden of proof and justified a sharp turn from the existing precedent in Gatlin.

The Commission's inadequately explained decision cannot be saved by embracing "post hoc rationalizations" for it. See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983) ("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action"). In defense of the Commission's decision, for instance, the Secretary distinguishes between the procedural posture of this case and Gatlin. But if the procedural posture provides the basis for the Commission's new test, then the Commission should

49

state that basis and explain why it proves persuasive. The Commission's decision says nothing about different burdens at different stages, so we cannot uphold it on that rationale. "[A]n agency's action may not be upheld on grounds other than those relied upon by the agency in the actual course of its decisionmaking." Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy, 654 F.3d 496, 513 (4th Cir. 2011).

Because the Commission's explanation does not indicate that it exercised reasoned judgment in changing course, I would remand the matter to the Commission and instruct it to explain its reasoning further.

B.

Remand for a further explanation does not cure the inadequacies in the process below. For that reason, I would also instruct the Commission to take an additional step. Once the Commission has explained the new standard -- with sufficient clarity for all parties to understand what must be proven and how it must be proven -- the Commission must then remand to the ALJ for further proceedings under the new standard. This remand is necessary because the Commission's midstream change of course

deprived Cobra of the basic due process of notice of the current standard and the opportunity to be heard under that standard.[12]

"[A]n agency is not precluded from announcing new principles in an adjudicative proceeding and . . . the choice between rulemaking and adjudication lies in the first instance within the agency's discretion." Yanez-Popp v. INS, 998 F.2d 231, 236 (4th Cir. 1993) (internal marks omitted) (quoting NLRB v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267, 294 (1974)). Thus, an agency can retroactively apply a rule announced in adjudication in the proper circumstances. SEC v. Chenery Corp., 332 U.S. 194, 203 (1937) ("That such action might have a retroactive effect was not necessarily fatal to its validity.").

Notwithstanding its adjudicatory power, an agency should tread carefully when changing the standards defining an adjudicatory process in the midst of that very process. Significant due process concerns develop if an agency does not permit a litigant to offer evidence and argument bearing on the new standard. See, e.g., Consol. Edison Co. of N.Y., Inc. v. Fed. Energy Regulatory Comm'n, 315 F.3d 316, 323 (D.C. Cir.

---

[12] If, after further considering its approach, the Commission decides to retain its previous Gatlin standard, then no remand to the ALJ would be necessary. In that circumstance, the Commission would decide the issue as it was originally submitted.

51

2003); <u>P.R. Aqueduct & Sewer Auth. v. EPA</u>, 35 F.3d 600, 607 (1st Cir. 1994); <u>Aero Mayflower Transit Co., Inc. v. Interstate Commerce Comm'n</u>, 699 F.2d 938, 942 (7th Cir. 1983); <u>Port Terminal R.R. Ass'n v. United States</u>, 551 F.2d 1336, 1345 (5th Cir. 1977); <u>Hill v. Fed. Power Comm'n</u>, 335 F.2d 355, 356 (5th Cir. 1964).

Two cases provide clear illustrations of the problems that may occur -- and the denial of due process that may result -- when the agency changes the burden of proof in the middle of the proceeding.

First, in <u>Woodward v. DOJ</u>, 598 F.3d 1311 (Fed. Cir. 2010), the Board of Justice Assistance adopted a new burden of proof in the midst of the petitioners' appeal seeking death benefits. The shift "changed the burden of proof from a lenient standard resolving any reasonable doubt in favor of the claimant to the more stringent standard requiring that a claimant prove all material issues by a 'more likely than not' standard." <u>Id.</u> at 1315. The petitioners then "had no opportunity to introduce additional evidence to satisfy the heightened burden of proof." <u>Id.</u> Because the Board "changed Petitioners' burden of proof during the course of their appeal," the Court remanded. <u>Id.</u>

In <u>Hatch v. FERC</u>, 654 F.2d 825 (D.C. Cir. 1981), the petitioner contended that the Federal Energy Regulatory Commission improperly adopted, "after the close of the

52

evidentiary hearing, . . . a new legal standard of proof, which he was given no opportunity to meet." Id. at 826. Just as in Woodward, the court in Hatch noted that agencies must generally provide notice of a change in the burden of proof and an opportunity to submit evidence under the new burden. Id. at 835. The D.C. Circuit indicated that an agency might avoid this general rule if (1) actual notice existed at the time of the initial hearing; or (2) the burden only changed the legal significance of evidence that the parties already submitted. Id. "But when . . . the change is a qualitative one in the nature of the burden of proof so that additional facts of a different kind may now be relevant for the first time, litigants must have a meaningful opportunity to submit conforming proof." Id. Finding that Hatch's situation involved this kind of "qualitative" change with no opportunity to submit evidence, the court remanded for an additional hearing. Id. at 837.

As in Woodward and Hatch, the Commission in the present case changed the quantum of proof -- from a preponderance standard to a "frivolous" standard -- after the close of the proceedings. It also changed the nature of the proof that the mine operator needed to offer. Under the prior test, the ALJ was to focus more upon the inevitability of the economic conditions giving rise to the potential tolling. Cobra, for instance, introduced evidence concerning (1) the company's

53

actual layoffs and (2) why those layoffs would have included Ratliff. The new test, however, focuses more on any potentially discriminatory factors behind the layoffs. Now, a mine operator will need to introduce additional evidence concerning the non-discriminatory intent of a layoff, even apart from the economic reasons behind it. Cobra should be provided the opportunity to introduce that kind of evidence in this case.

Apart from these burden-of-proof-specific issues, agencies also act unjustly when they switch rules actually relied upon by the parties in the midst of the process. See ARA Servs., Inc. v. NLRB, 71 F.3d 129, 134-36 (4th Cir. 1995) (noting reliance interests in finding that new rule developed in adjudication would not be retroactively applied to case on appeal); accord Negrete-Rodriguez v. Mukaskey, 518 F.3d 497, 503-04 (7th Cir. 2008); BP W. Coast Prods., LLC v. Fed. Energy Regulatory Comm'n, 374 F.3d 1263, 1280 n.4 (D.C. Cir. 2004); Consol. Edison Co., 315 F.3d at 323. The Supreme Court has instructed agencies to consider reliance interests when shaping agency positions. See, e.g., Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2167 (2012) (explaining that a party should receive "fair warning" and not "unfair surprise"); Fox Television Stations, 556 U.S. at 515 (explaining that it is arbitrary and capricious for an agency to ignore "serious reliance interests" that a prior policy "engendered"). Nevertheless, even though both the

54

Secretary and Cobra utilized a preponderance standard before the ALJ, the Commission developed its new standard without addressing these reliance interests.

I would direct the Commission to return this case to the ALJ in order to afford the parties the opportunity to present their cases under whatever standard the Commission determines would now apply.

## IV.

For the aforementioned reasons, I respectfully dissent.